IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEGGY JOHNSON, Individually    §
and as the Administratrix of   §
the Estate of EUGENE JOHNSON,  §
and as Next Friend of          §
DAVID JOHNSON, JONATHAN JOHNSON,§
                               §
              Plaintiff,       §
                               § Civil Action No. 3:04-CV-2066-D
VS.                            §
                               §
JOHNSON COUNTY,                §
                               §
              Defendant.       §

MEMORANDUM OPINION
AND ORDER

In this removed action, plaintiff Peggy Johnson ("Peggy"),
individually and as the Administratrix of the Estate of Eugene
Johnson, and as next friend of David Johnson and Jonathan Johnson,
sues defendant Johnson County, alleging that it is liable under 42
U.S.C. § 1983 for the suicide of her husband, Eugene H. Johnson
("Eugene"), who was at the time a pretrial detainee in the Johnson
County Jail.  Johnson County moves for summary judgment.  For the
reasons that follow, the court grants the motion as to Peggy's
§ 1983 claims and dismisses them with prejudice.  The court in its
discretion remands her state-law claim to state court.

I

On the afternoon of September 1, 2002, Peggy met with James L.
Dorsey ("Deputy Dorsey"), a Johnson County Deputy Sheriff,

regarding a domestic violence complaint against Eugene.[1]   Among other things, Peggy told Deputy Dorsey that Eugene had assaulted her, threatened to burn down her father's house, and attempted suicide, and that she was seeking a divorce.   During the meeting, Peggy's sister called and informed her that Eugene had passed out and was lying under his car, with their children inside.   Peggy advised Deputy Dorsey of the situation, he contacted Sheriff's Office dispatch to call an ambulance, and he told her to follow him to the scene.

When Deputy Dorsey and Peggy arrived, a Fire Department ambulance was there, as was Peggy's sister.   Johnson County Sheriff's Deputies Brad Bollin ("Deputy Bollin") and Kenneth Bradley Watson ("Deputy Watson"), a trainee, arrived within minutes.   Deputy Bollin smelled a strong odor of alcohol on Eugene, who advised him that he had consumed a six-pack of beer.   Eugene denied having an altercation with Peggy, admitted he was going through a divorce, made statements about his ability to purchase armor-piercing ammunition, and stated that he had attempted suicide in the past.   Eugene was eventually arrested for public intoxication.   Peggy told Deputies Dorsey and Bollin that she was concerned about Eugene's intoxicated, upset, depressed, and

---

[1]The court recounts the evidence in a light favorable to Peggy, as the summary judgment nonmovant, and draws all reasonable inferences in her favor.  *See, e.g., Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000).

- 2 -

potentially suicidal state.  She said, in relevant part: "If you take him in, he's suicidal.  He's already tried to kill himself once.  I've hid his guns from him repeatedly.  He gets mad."  P. App. 42.

Deputies Bollin and Watson drove Eugene to the jail.  Deputy Bollin filled out the requisite booking paperwork, including a Receiving Screening Form.  Near the top of the form, in the blank that specifically asks the arresting/transporting officer about, *inter alia*, "suicide tendencies,"[2] Deputy Bollin wrote in capital letters, "SUICIDAL TENDENCIES." P. App. 103.  He wrote nothing else on the form besides Eugene's name.  Deputy Bollin gave the paperwork to Sergeant Toni Prine ("Sgt. Prine"), a corrections officer employed by the Johnson County Sheriff's Department.  Sgt. Prine did not notice the "SUICIDAL TENDENCIES" notation.  Deputies Bollin and Watson departed.  Sgt. Prine directed another officer to issue Eugene a mattress cover, blanket, towel, cup, and spoon and had him dressed in a jail uniform.  Between 6:00 p.m. and 6:10 p.m., Sgt. Prine had Eugene placed in a holding cell in the book-in area.  She then booked another prisoner into the Jail.  At approximately 6:30 p.m., a jail trustee discovered that Eugene had committed suicide.  He had made a noose from his mattress cover and

---

[2]The blank contains the statement of the arresting/transporting officer that "This inmate has no injuries, mental disabilities, recent accident, suicide tendencies, trauma or medical conditions known to me except the following[.]"  P. App. 103.

hung it over a welded steel frame in his cell.

Peggy sues Johnson County under § 1983[3] and the Texas Tort Claims Act. She alleges under § 1983 that the County had unconstitutional policies that resulted in the denial of medical and psychological treatment to Eugene that would have prevented his death by suicide; lacked policies to ensure that medical and psychological treatment was provided to incarcerated persons with serious medical or psychological conditions, which resulted in Eugene's suicide; utilized procedures or customs at the Jail that resulted in Eugene's suicide; and failed to train or inadequately trained arresting officers and/or employees who were responsible for the operation of the Jail. She avers that Johnson County is liable under state law because Eugene's death was occasioned through the use and/or misuse of real and tangible personal property. Peggy brought suit in Texas state court, and Johnson County removed the case to this court based on federal question jurisdiction. It moves for summary judgment on all of Peggy's claims.

---

[3]Peggy does not specify in her state-court petition that she is suing under § 1983. Johnson County removed the case on this basis, however, and it is clear from Peggy's summary judgment response that her first four claims are asserted under § 1983. *See* P. Br. 1-2 (referring to her "§ 1983 claims.").

II

"Section 1983 creates a private right of action for redressing the violation of federal law by those acting under color of state law." *Colson v. Grohman*, 174 F.3d 498, 504 n.2 (5th Cir. 1999) (citation omitted). "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates. Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983." *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citations and internal quotation marks omitted) (quoting *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989)).

"[S]ince pretrial detainees and convicted state prisoners are similarly restricted in their ability to fend for themselves, the State owes a duty to both groups that effectively confers upon them a set of constitutional rights that fall under the [Supreme] Court's rubric of 'basic human needs.'" *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). "Pretrial detainees and convicted prisoners, however, look to different constitutional provisions for their respective rights to basic needs such as medical care and safety." *Id.* As a pretrial detainee, Eugene's constitutional rights flowed from the due process guarantees of the Fourteenth Amendment rather than from the Eighth Amendment's prohibition against cruel and unusual punishment. *See id.* The Fifth Circuit has recognized, however,

- 5 -

that "there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care." *Gibbs v. H.M. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

In sum, although Peggy does not cite § 1983 or a provision of the United States Constitution in her petition, *see supra* note 3, it is clear that her first four counts allege causes of action under § 1983 premised on a series of alleged violations of Eugene's Fourteenth Amendment due process rights.  The court will first consider Peggy's § 1983-based claims and then turn to her state-law claim in count V.

III

To determine the appropriate standard to apply in analyzing constitutional challenges under § 1983 by pretrial detainees, the Fifth Circuit has directed courts first to classify the challenge as an attack on a "condition of confinement" or as an "episodic act or omission." *Flores v. County of Hardeman*, *Tex.*, 124 F.3d 736, 738 (5th Cir. 1997) (citing *Hare*, 74 F.3d at 644).

A

"A 'condition of confinement' case is a constitutional attack on 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Id.* (quoting *Hare*, 74 F.3d at 644).  "In such cases, the reasonable relationship test of *Bell v. Wolfish*, 441 U.S. 520 (1979), is apposite, as [the court] may safely assume,

- 6 -

by the municipality's very promulgation and maintenance of the complained-of condition, that it intended to cause the alleged constitutional deprivation." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc) (citing *Hare*, 74 F.3d at 645).

If the complained-of harm is a particular act or omission of one or more officials, the action is characterized as an "episodic act or omission" case. *See Hare*, 74 F.3d at 645.

> In an episodic act or omission case, an actor is usually interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom or rule (or lack thereof) of the municipality that permitted or caused the act or omission. The detainee in such a case must establish that the official(s) acted with subjective deliberate indifference to prove a violation of his constitutional rights.

*Flores*, 124 F.3d at 738 (citing *Scott*, 114 F.3d at 54). To succeed in holding the County liable for such a violation, Peggy must show that a County employee (1) violated Eugene's clearly established constitutional rights with subjective deliberate indifference and (2) the violation resulted from a County policy or custom adopted or maintained with objective deliberate indifference. *Id.* (citing *Scott*, 114 F.3d at 54).

Notably, "the reasonable-relationship test employed in conditions cases is 'functionally equivalent to' the deliberate indifference standard employed in episodic cases." *Scott*, 114 F.3d at 54.

B

Although some parts of Peggy's first four claims could be interpreted to complain of conditions, *see, e.g.,* Pet. count II, both parties acknowledge that this case falls into the "episodic act or omission" category. *See* P. Br. 6 ("In the present case, the constitutional violation was an episodic omission by the arresting officers and the officers at the Jail . . . ."); D. Br. 5, 15-18 (arguing that no County employee violated Eugene's clearly established constitutional rights with subjective deliberate indifference). The Fifth Circuit has likewise categorized pretrial detainee suicide cases as "episodic act or omission" cases. *See Flores*, 124 F.3d at 738 (holding that, although plaintiffs attempted to plead both episodic and conditions case, "it is clear" that fact of jail suicide was episodic act or omission case);[4] *Scott*, 114 F.3d at 53-54 (holding that case was episodic act or omission case, notwithstanding that plaintiff-victim of sexual assault by jailer pleaded case as conditions case); *Hare*, 74 F.3d at 645, 650 (applying episodic act or omission rubric to jail suicide).[5]   The court will therefore analyze Johnson County's

---

[4]In *Flores* the plaintiffs had attempted to allege a conditions case based on the defendant-county's training and staffing policies. *See Flores*, 124 F.3d at 738. Peggy, too, includes a training-based claim. *See* Pet. count IV. This claim is treated as an "episodic act or omission" claim under circuit precedent. *See Flores*, 124 F.3d at 738.

[5]Peggy does not contend that, because she did not sue a County employee individually, she need not demonstrate the first step of

motion as addressing an episodic act or omission.

C

Because the County will not have the burden of proof at trial as to Peggy's § 1983 claims, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support them. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once it does so, Peggy must go beyond her pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for Peggy. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In this case, Peggy must adduce evidence that would permit a reasonable jury to find that a Johnson County employee violated Eugene's clearly established constitutional rights with subjective deliberate indifference, and that the violation resulted from a County policy or custom adopted or maintained with objective deliberate indifference. Summary judgment is mandatory if Peggy

─────────────

an episodic act or omission case: the subjective deliberate indifference of the officer and/or the jailer. Nor does she assert a condition-of-confinement claim. *Cf. Scott*, 114 F.3d at 54 ("As in most cases involving incidents at jails, the defendants here are both individual . . . and governmental . . . ."); *see Posey v. Sw. Bell Tel. L.P.*, ___ F.Supp.2d ___, 2006 WL 757961, at *5 (N.D. Tex. Mar. 24, 2006) (Lindsay, J.) (granting summary judgment where plaintiffs only sued county because, *inter alia,* plaintiffs failed to demonstrate county employees acted with subjective deliberate indifference).

fails to meet this burden. *Little*, 37 F.3d at 1076. Additionally, if Peggy cannot create a genuine issue of material fact concerning the first element of her claims, the court need not address the second. "The summary judgment nonmovant's failure to adduce proof as to any essential element of [her] cause of action renders all other facts immaterial." *Edgar v. Gen. Elec. Co.*, 2002 WL 318331, at *4 (N.D. Tex. Feb. 27, 2002) (Fitzwater, J.) (citing *Celotex Corp.*, 477 U.S. at 323).

IV

A

In *Hare* the *en banc* Fifth Circuit adopted for use in episodic act or omission cases the formulation of the deliberate indifference test that the Supreme Court had recently outlined in *Farmer v. Brennan*, 511 U.S. 825 (1994).[6]  In *Farmer* the Court held "that a prison official may be held liable under the Eighth Amendment for denying humane conditions only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.  Consequently,

---

[6]It did so although *Farmer* concerned a violation of a convicted prisoner's Eighth Amendment rights. *See Hare*, 74 F.3d at 648-50.

> [d]eliberate indifference in the context of an
> episodic failure to provide reasonable medical
> care to a pretrial detainee means that: 1) the
> official was aware of facts from which an
> inference of substantial risk of serious harm
> could be drawn; 2) the official actually drew
> that inference; and 3) the official's response
> indicates the official subjectively intended
> that harm occur.

*Thompson v. Upshur County, Tex.*, 245 F.3d 447, 458-59 (5th Cir.

2001) (citing *Hare*, 74 F.3d at 643, 649-50). Deliberate

indifference, however, "cannot be inferred merely from a negligent

or even a grossly negligent response to a substantial risk of

serious harm." *Id.* (citing *Hare*, 74 F.3d at 645, 649). To apply

the *Farmer* test, each individual's subjective deliberate

indifference must be examined separately. *Lawson v. Dallas County*,

286 F.3d 257, 262-63 (5th Cir. 2002); *see Stewart v. Murphy*, 174

F.3d 530, 537 (5th Cir. 1999).

B

Peggy contends preliminarily that, once she adduced evidence

that a substantial risk of harm existed and that the risk to Eugene

was obvious, at least to a reasonable person, the burden shifted to

Johnson County to prove affirmatively that the official did not

have knowledge of the risk. She posits that, once she produced

circumstantial evidence that the risk was obvious (establishing

that the official *should* have known), the jury must decide whether

the official *did* know of the risk.

The court rejects Peggy's formulation of her burden as to this

element of her § 1983 claims.  First, it is counter to the Fifth
Circuit's holding in *Hare* that a pretrial detainee has the burden
of establishing that an official acted with subjective deliberate
indifference.  *See Hare*, 74 F.3d at 649 n.4.  Second, it would use
an *objective* deliberate indifference standard to shift the burden
to the defendant and create a genuine issue of material fact.  The
Supreme Court in *Farmer* specifically rejected the use of a civil-
law objective standard of recklessness in the Eighth Amendment
context, and the Fifth Circuit in *Hare* has imported that standard
into the Fourteenth Amendment context.  *See Farmer*, 511 U.S. at
847; *Hare*, 74 F.3d at 648-50.  Third, adopting such a paradigm
would risk injecting a negligence standard into the assessment of
the conduct of jail officials, which *Hare* rejects.  *See Hare*, 74
F.3d at 649-50.  This is because a jail officer would have the
burden of proving that he did not act with knowledge of a risk,
once the plaintiff adduced evidence that a reasonable official
would have been aware of the risk.

C

Both Peggy and Johnson County focus their arguments on the
first two prongs of the subjective deliberate indifference test:
the official's awareness of facts from which an inference of
substantial risk of serious harm could be drawn, and whether the
official actually drew that inference.  *See Thompson*, 245 F.3d at
458-59.  As discussed *infra* at § IV(D) and (E), however, the

principal question as to at least two officials concerns the third prong. Because the parties fail to address this component in any detail, it is necessary to review Fifth Circuit precedent that informs whether an official's response would permit a reasonable jury to find there was subjective intent that the harm occur. Notably, there are relatively few such cases, because decisions that address pretrial detainees who allege this type of § 1983 claim frequently focus on the defense of qualified immunity, which is inapplicable in this case because Peggy sues only Johnson County. And analyzing qualified immunity involves applying a slightly different test than the one announced in *Farmer* and adopted in *Hare*. *See Thompson*, 245 F.3d at 459 (highlighting "the importance of appreciating the difference between the objective reasonableness standard for qualified immunity . . . and the subjective deliberate indifference standard for section 1983 liability").

*Lawson* illustrates conduct that would permit the finding of subjective intent that harm occur. In *Lawson* the Fifth Circuit upheld the district court's conclusion that jail medical staff were subjectively deliberately indifferent to a paraplegic detainee. After the detainee's incarceration, a doctor at the jail diagnosed him with decubitis ulcers, which can occur in paraplegics who do not receive proper care and can also be life-threatening. *Lawson*, 286 F.3d at 260. The physician ordered the nurses to change his

dressings three times per day.  The nurses disregarded the order, instead following jail policy to change dressings only twice daily. *Id.*  At one point, the detainee received no dressing changes for nine successive days.  *Id.* at 261.  Jail medical staff twice sent him to the hospital, which returned him both times with medically necessary orders to, *inter alia*, change the dressings three times daily.  *Id.*  The jail medical staff did not follow the instructions either time.  *Id.*  The detainee eventually was returned to the hospital, which refused to release him to the jail, determining that it could not treat him.  *Id.*  The circuit court held that jail medical personnel who treated Lawson had actual knowledge of the risk to his health, but consciously disregarded it.  *Id.* at 263. Specifically, they "must have observed first-hand the large holes developing in [the detainee's] skin" over nearly a month and knew about the doctors' orders but chose not to follow them, thus exhibiting deliberate indifference.  *Id.* at 262; *see Scott*, 114 F.3d at 54 (holding that plaintiff-pretrial detainee had met summary judgment burden of establishing subjective deliberate indifference where jailer repeatedly sexually assaulted her).

By contrast, in *Flores* the circuit court concluded, *inter alia*, that the summary judgment evidence did not raise a genuine issue of material fact as to whether a sheriff acted with subjective deliberate indifference toward a pretrial detainee who committed suicide.  The sheriff, who had known the decedent "all of

his life," felt he was "not acting like himself," and, after detainment, gave orders to check on him every half hour (instead of the usual one-hour checks), to strip him to his underwear, and to give him only a mattress and pillow (instead of the full issue of inmate supplies). *Flores*, 124 F.3d at 737. The decedent never threatened suicide and, the following morning, was taken to his arraignment. *Id.* His father, who was present at the arraignment, testified that he did not think the decedent was contemplating suicide. *Id.* The protective measures were lifted following the arraignment, and he committed suicide that afternoon. *Id.* The Fifth Circuit concluded that the sheriff took "appropriate action" in instituting the protective measures for a 12-hour period, and that his decision to discontinue the measures was not, "as a matter of law, deliberately indifferent." *Id.* at 738-39; *see also Gibbs*, 254 F.3d at 550 (affirming summary judgment and holding that jailers did not act with deliberate indifference where they refused to give tuberculosis test to pretrial detainee, since they did not know of any diagnosed active cases of disease).

In adopting the *Farmer* test, the Fifth Circuit observed in *Hare* that it "purports to distinguish" errant inaction, which does not constitute subjective deliberate indifference, from the infliction of punishment, which does. *Hare*, 74 F.3d at 649. In *Lawson*, knowing the risk of harm to a detainee, witnessing his medical condition worsen over nearly four weeks, and deciding

multiple times to disregard medical orders constituted subjective deliberate intent to cause harm.  In *Flores*, knowing the risk of harm that a pretrial detainee posed to himself, instituting protective measures for a 12-hour period, and eventually lifting those measures did not rise to that level.  Keeping these contrasting factual scenarios in mind, the court turns to Peggy's claim that Johnson County employees were subjectively deliberately indifferent to Eugene.

D

Peggy maintains that she has satisfied her summary judgment burden as to deliberate indifference by showing that Deputies Dorsey and Bollin and Sgt. Prine were subjectively, deliberately indifferent to Eugene's suicide risk.  She contends that Deputy Dorsey was aware that Eugene was a risk to himself and others, but failed to take steps to ensure that he would not be a threat to himself.  She points to Deputy Dorsey's affidavit, in which he averred that Eugene informed him that he had attempted suicide two weeks before his arrest.  Peggy argues that, because when he arrived on the scene, Deputy Dorsey possessed this knowledge, he should have taken steps to ensure that Eugene would not be a threat to himself.  Instead, Deputy Dorsey chose not to do so and concurred with Deputy Bollin to arrest Eugene and take him to jail. Peggy asserts that Deputy Dorsey was indifferent to Eugene's risk because he knew that Eugene was a risk but failed to take any

- 16 -

further action to protect against the risk.

The court holds that Peggy has proffered sufficient evidence that Deputy Dorsey knew that Eugene had in the past attempted suicide and that he might do so again in the future, i.e., that Deputy Dorsey was aware of facts from which an inference of substantial risk of serious harm could be drawn. *See Thompson*, 245 F.3d at 458-58. She has failed, however, to cite summary judgment evidence that would permit a reasonable jury to find that Deputy Dorsey was deliberately indifferent, that is, not only that he was aware of facts from which an inference of substantial risk of serious harm could be drawn and that he actually drew that inference, but that his response indicates he subjectively intended that harm occur.

Peggy simply asserts, without citing the summary judgment record, that Deputy Dorsey knew that Eugene was a risk "yet he failed to take any further action to protect against this risk." P. Br. 10. Deputy Dorsey's inaction is not comparable to the jail medical staff in *Lawson*, who deliberately chose not to follow medical advice and witnessed the harm to the detainee intensify daily. The decisions in *Lawson* were made repeatedly and consciously and had the direct effect of harming the detainee.

And Deputy Dorsey's response that Eugene be arrested and taken into custody does not indicate that he made a conscious choice with intent that Eugene harm himself. Rather, a reasonable jury could

only find that Deputy Dorsey took "appropriate action" by placing Eugene in custody.  *See Flores*, 124 F.3d at 739.  Deputy Dorsey testified that, based on Eugene's behavior and Peggy's reports of family violence, he and Deputy Bollin decided to arrest Eugene.  A reasonable jury could only find that his acts indicate concern not only for the well-being of Eugene, but also for the safety of the Johnson family.  A reasonable jury could not find that Deputy Dorsey's response was "errant" or negligent.  *Hare*, 74 F.3d at 649.

Accordingly, the court concludes that Peggy has failed to proffer summary judgment evidence from which a reasonable jury could find that Deputy Dorsey was subjectively, deliberately indifferent to the risk of harm to Eugene.

E

Peggy next maintains that Deputy Bollin was indifferent.  She relies on evidence that, in response to the stated intentions of Deputies Bollin and Dorsey that they were taking Eugene to jail to sleep off his intoxicated state, she "expressed to them very clearly, very plainly, that [she] was afraid [Eugene would] kill himself."  P. Br. 10 (first alteration in original).  Peggy also testified that she warned Deputy Dorsey, that "[i]f you take him in, he's suicidal.  He's already tried to kill himself once.  I've hid his guns from him repeatedly.  He gets mad."  P. App. 42.  She contends her statement was a clear indication that Eugene was a current suicidal threat and that it was obvious from her

- 18 -

communications that he posed a substantial risk to himself. Nevertheless, neither Deputy Dorsey nor Deputy Bollin took any additional steps to determine whether Eugene needed any kind of special care or to be transported to the hospital rather than to the Jail, and instead transported him to the Jail for the night. Peggy relies on Deputy Bollin's admission that he knew Eugene was disoriented, that Eugene had told Deputy Bollin that he could buy armor piercing ammunition but that he would not use it to kill himself because that was between "him and God." P. Br. 11 (quoting P. App. 104). She maintains that Deputy Bollin was aware that Eugene had attempted suicide in the past and admitted in his deposition that, based on this knowledge, he felt he needed to ask Eugene questions when he arrested him. She also cites Deputy Bollin's concession that he knew the behavioral signs of a suicidal person, and she points to deposition testimony of the County's expert witness, who opined that one sign to look for is intoxication and a change of behavior from belligerent and combative to very quiet. Peggy cites Deputy Bollin's deposition testimony that Eugene was belligerent upon arrest but became very calm at the time he arrived at the Jail. She also maintains that Deputy Bollin signed a probable cause affidavit in which he swore that Eugene was a danger to himself and others. Finally, she argues that Deputy Bollin drew the inference that there was a substantial risk because he wrote on the Receiving Screening Form

"SUICIDAL TENDENCIES."[7]   Peggy argues that Deputy Bollin was aware that Eugene was a substantial risk to himself but failed to inform Sgt. Prine or any other officer working at the Jail on September 1, 2002 that Eugene was a suicidal risk and had previous suicidal ideations.   She urges that this amounts to deliberate indifference because he knew of the substantial risk but failed to communicate it to Sgt. Prine or any other jail officer, thereby ensuring there was an awareness of the risk.

Johnson County cites Deputy Bollin's deposition and urges that, while he believed Eugene may have posed a risk of accidental harm to himself and others due to his intoxicated state, he did not feel that Eugene was at risk to intentionally harm himself or commit suicide.   And although Eugene referred to prior suicide attempts, he indicated to Deputies Bollin and Dorsey at the scene that he had no present intentions of harming himself.   Johnson County posits that when Deputy Bollin wrote on the Receiving Screening Form that Eugene had "SUICIDAL TENDENCIES," he was merely noting that Eugene had exhibited suicidal tendencies in the past; had Deputy Bollin perceived such a risk, he would have taken steps to ensure that Eugene received proper mental health care and would at least have advised jail staff of the problem so that suicide

---

[7]Peggy contends that Deputy Bollin underlined "SUICIDAL TENDENCIES."   *See* P. Br. 12.   A reasonable jury could only find, however, that what Peggy says is underlining is part of the pre-printed form.   *See* P. App. 103.

prevention measures could be taken.

The court holds that a reasonable jury could find that Deputy Bollin was aware of facts from which an inference of substantial risk of serious harm could be drawn and that Deputy Bollin actually drew that inference. A reasonable assessment of Deputy Bollin's notation on the Receiving Screening Form that Eugene had "SUICIDAL TENDENCIES" is that Deputy Bollin intended to make jail officials aware that Eugene posed a present danger to himself, since the form equated suicidal tendencies with known mental disabilities, trauma, or medical conditions. *See* P. App. 103; *cf. Posey v. Sw. Bell Tel. L.P.*, ___ F.Supp.2d ___, 2006 WL 757961, at *5 (N.D. Tex. Mar. 24, 2006) (Lindsay, J.) (granting summary judgment in favor of defendant county where plaintiffs failed to show that jail personnel were deliberately indifferent to risk of suicide, where there was no evidence that decedent had previously attempted suicide, that county had knowledge of such attempt, or that decedent indicated he was contemplating suicide). This conclusion, however, does not end the inquiry, because Peggy must proffer evidence from which a reasonable jury could infer that Deputy Bollin's response indicated that he intended that the harm occur.

Peggy complains about Deputy Bollin's response at two separate points in time: Eugene's arrest and the Jail drop-off. Because the court has already considered Deputy Dorsey's decision to place Eugene into custody and concluded that a reasonable jury could not

find that it was subjectively, deliberately indifferent, *see supra* at § IV(D), the court concludes for the same reasons that Deputy Bollin's response of arresting Eugene could not be found to be deliberately indifferent.

Peggy makes an additional contention with respect to Deputy Bollin: that his failure to take steps to determine whether Eugene needed to be transported to the hospital constituted indifference. *See* P. Br. 10.[8]  Peggy does not identify what additional steps Deputy Bollin should have but failed to take.  Absent such a specification, a reasonable jury could not infer that Deputy Bollin subjectively and deliberately intended that harm occur to Eugene. Moreover, even viewing the evidence favorably to Peggy, Eugene was acting not only in an erratic manner but posed a potential danger to others.  He mentioned being able to purchase "armor piercing ammunition" and that he was drunk.  P. App. 104.  Peggy stated that she told the Deputies that Eugene possessed multiple guns, that he "gets mad," and that she had to hide "his guns from him repeatedly."  P. App. 42.  Deputy Bollin opted to place Eugene in custody and to take him to Jail.  The only reasonable inference that a jury could draw from these facts is that Deputy Bollin's

---

[8]It is unclear whether Peggy also asserts this argument against Deputy Dorsey.  The contention appears in a paragraph of her brief that concerns Deputy Bollin, but the sentence refers to both Deputies.  *See* P. Br. 10.  Even assuming *arguendo* that she raised it as to Deputy Dorsey, it fails for the same reason: it does not indicate that Deputy Bollin intended that the harm to Eugene occur.

response was reasonable and was made with the intent not only to protect Eugene but to protect others to whom he posed a potential danger.

Moreover, a reasonable jury could not find that Deputy Bollin's response at the Jail was deliberately indifferent. His decisions would only reasonably permit the contrary finding that, aware of the risk that Eugene may harm himself, Deputy Bollin attempted to communicate his concern to jail officers. And assuming that Deputy Bollin's failure to *orally* communicate his concern to jail officers was negligent or even grossly negligent, this does not rise to the level of subjective deliberate indifference. This failure is akin to the sheriff's decision in *Flores* to remove the protective measures around the detainee. *See Flores*, 123 F.3d at 738-39. In both instances one could conclude in hindsight that the decisions were "ill advised." *Id.* at 739. Neither was made, however, with the intention that harm occur. By contrast, in *Lawson* the jail medical staff must have known that the detainee's wounds would only worsen, because they failed to follow medical advice. *See Lawson*, 286 F.3d at 263. A reasonable jury could not infer that Deputy Bollin possessed a similar intent by failing to notify jail staff orally of his knowledge of a potential risk. Accordingly, Peggy has to failed present evidence that would permit a reasonable jury to find Deputy Bollin's response indicated that he intended that harm occur to Eugene.

- 23 -

F

Peggy urges that Sgt. Prine was subjectively, deliberately indifferent to Eugene's suicide risk. She asserts that Sgt. Prine placed Eugene in the cell without first processing any of his booking information. Instead, she directed another officer to dress him in a uniform, issue him a mattress cover, blanket, towel, cup, and spoon, and provide him dinner. Peggy responds to Sgt. Prine's assertion that she was unaware of the suicide risk because Deputy Bollin did not verbally communicate this to her and she did not see the Receiving Screening Form on which he wrote "SUICIDAL TENDENCIES," by positing that Sgt. Prine knew that suicide was a potential and substantial risk with detainees. According to Peggy, this is because Sgt. Prine had experienced many suicide attempts and two successful suicides during her employment with Johnson County, and she was aware that detainees often used, *inter alia*, mattress covers to hang themselves. Peggy complains that, although Sgt. Prine may not have known that Eugene in particular was a suicide risk, she knew that there was a substantial risk of suicide for detainees generally, and she was aware of the substantial risk that detainees pose. Relying on *Farmer*, she reasons that Sgt. Prine cannot escape liability for deliberate indifference by "showing that, while [she] was aware of an obvious, substantial risk to inmate safety, [she] did not know that the complainant was especially likely to be [at risk]." P. Br. 13 (quoting *Farmer*, 511

- 24 -

U.S. at 843 (last alteration in brief)).  She posits that, despite the known risk that people brought to jail need to be evaluated for suicidal ideations, Sgt. Prine placed Eugene in a cell without first processing his booking sheets, which would have shown that Eugene had "SUICIDAL TENDENCIES."  Peggy maintains that the officers involved in booking Eugene were deliberately indifferent because they knew that detainees posed a suicidal risk but placed him in a cell without evaluating the risk.  She contends that Sgt. Prine knew that all persons taken into custody might pose a suicide risk, that proper evaluation and classification was necessary, but they failed to perform the evaluation and classification before placing Eugene in a cell with implements that would enable him to hang himself.

Johnson County argues that Sgt. Prine was not deliberately indifferent to the risk that Eugene would commit suicide.  It points to Sgt. Prine's affidavit, in which she states that nothing about Eugene led her to believe that he was suicidal or otherwise posed a risk of harm to himself.  She also avers that, through oversight or mistake, she did not notice the "SUICIDAL TENDENCIES" notation on the Receiving Screening Form, and she did not believe that Eugene was suicidal.

The court rejects Peggy's contention that, because pretrial detainees are especially likely to commit suicide and had done so twice before during Sgt. Prine's employment with Johnson County,

- 25 -

Sgt. Prine was aware of a substantial risk of harm and opted to ignore it by placing Eugene in his cell before evaluating and classifying him. First, the summary judgment evidence would not permit a reasonable jury to find that Sgt. Prine failed to classify Eugene; it would only permit the finding that, with the benefit of hindsight, she incorrectly classified him. Sgt. Prine stated that nothing led her to believe that Eugene was suicidal and, had she known otherwise, she would have acted differently. This is not evidence of deliberate indifference, even if her failure to review his Receiving Screening Form before placing him in his cell may have constituted negligence or even gross negligence. *Cf. Flores*, 124 F.3d at 737 (reciting facts that sheriff knew of risk that individual detainee would potentially harm himself upon detention and finding no indifference).

Second, a reasonable jury could not infer deliberate indifference based on Sgt. Prine's knowledge about the general risk of pretrial detainee suicide because, in these circumstances, it could not find that it rises to the level of "obvious, substantial risk to [pretrial detainee] safety" that the Supreme Court identified in *Farmer*. For this proposition, the Court cited *Hutto v. Finney*, 437 U.S. 678, 681-82 n.3 (1978), in which prison officials had knowledge of more specific information than mere awareness of a general risk of harm. *See Farmer*, 511 U.S. at 843-44.

- 26 -

> If, for example, prison officials were aware
> that inmate rape was so common and
> uncontrolled that some potential victims dared
> not sleep [but] instead . . . would leave
> their beds and spend the night clinging to the
> bars nearest the guards' station, it would
> obviously be irrelevant to liability that the
> officials could not guess beforehand precisely
> who would attack whom.

*Id.* (internal quotation marks and citation omitted) (quoting *Hutto*, 437 U.S. at 681-682 n.3). Peggy contends only that Sgt. Prine knew that pretrial detainees were generally at risk for suicide, that several had attempted suicide during her employment tenure with Johnson County, and that two had been successful. A reasonable jury could not infer deliberate indifference to Eugene based only on such undifferentiated knowledge. Accordingly, the court holds that a reasonable jury could not find that Sgt. Prine was aware of facts from which an inference of substantial risk of serious harm to Eugene could be drawn. It need not address whether a reasonable jury could find that she intended that harm occur to Eugene.

G

Although several hours elapsed between the time Peggy visited with Officer Dorsey on the afternoon of September 1, 2002 and Eugene's death between 6:00 and 6:30 p.m., the principal points in time when Peggy contends County employees were deliberately indifferent to Eugene occurred in rather quick succession. Eugene was arrested, transported to the Jail, booked into the Jail while another detainee was arriving, and committed suicide within one-

half hour of being placed in his cell.  The decisions Peggy complains about were made quickly, and the speed with which events unfolded tends to undercut a reasonable finding that they were made deliberately, with intent that harm come to Eugene.  By comparison, in *Lawson* the jail medical staff observed the inmate's wounds worsen over a month-long period, receiving instructions that they did not follow on at least three separate occasions.  This case does not present circumstances in which law enforcement and jail officials repeatedly made the same choice while witnessing the resulting harm.[9]

In this case, a reasonable jury could essentially only find that, following Eugene's arrest, there was a regrettable communication failure at the Jail between Deputy Bollin and Sgt. Prine that had tragic consequences for Eugene and his family.[10]  A reasonable jury could not find that the *Hare* standard has been met.

_____

[9]The court does not, of course, foreclose the possibility that an official's single decision, made quickly, could in other circumstances constitute deliberate indifference.  Nor does the court suggest by its repeated comparisons of these facts to those of *Lawson* that only evidence identical or substantial similar to *Lawson* would permit a finding of subjective deliberate indifference.  *Lawson* is helpful, however, in understanding what is necessary to make the required showing.

[10]In reaching this conclusion, the court suggests no view concerning the viability of Peggy's state-law claim.  For example, this conclusion is not intended to address whether Eugene's death was occasioned through the use and/or misuse of tangible personal property.

> The episodic act or omission of a state jail
> official does not violate a pretrial
> detainee's constitutional right to be secure
> in his basic human needs, such as medical care
> and safety, unless the detainee demonstrates
> that the official acted or failed to act with
> deliberate indifference to the detainee's
> needs.

*Hare*, 74 F.3d at 647-48.  This requires, *inter alia*, that the official's response indicate that the official subjectively intended that harm occur.  Although, viewed favorably to Peggy, the decisions she complains about were, in hindsight, ill advised, she fails as in *Flores* to direct the court to any that a reasonable jury could find were made with the subjective intent that harm occur.  At best, Peggy has presented summary judgment evidence of negligence or arguably gross negligence; however, neither can be the basis for a § 1983 claim.  The Fourteenth Amendment Due Process Clause does not in these circumstances provide a remedy for Eugene's death by suicide.

Because Peggy has not adduced evidence that would permit a jury to find in her favor on the first element of her § 1983 claims, the court need not decide whether she has demonstrated that Eugene's death resulted from a County policy or custom adopted and maintained with objective deliberate indifference.  *See Edgar*, 2002 WL 318331, at *4 (holding that summary judgment nonmovant's failure to adduce proof as to any essential element of cause of action renders all other facts immaterial).

V

The court now turns to Peggy's state-law claim alleged in count V of her petition.

Peggy alleges that the County is liable under state law for damages because Eugene's death was occasioned through the use and/or misuse of real and tangible personal property. Both parties contend that this claim presents a tort cause of action arising under Texas law and that the petition seeks to plead an exception to governmental immunity under the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code § 101.021 (Vernon 2005 & Supp 2005). *See, e.g.,* P. Br. 30; D. Br. 33.

Having dismissed Peggy's federal question claims, only her pendent state-law claim remains. When the federal claims are dismissed from a case removed on the basis of a federal question, the court has the discretion to remand the state claims to state court. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988). The court opts to do so here. The Texas Tort Claims Act is a difficult statute even for Texas state courts to interpret and apply. *See, e.g., Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 342 (Tex. 1998) ("The many compromises necessary to pass the Act obscured its meaning, making its application difficult in many cases, including this one."). Peggy's state-law claim presents issues of state-law that should be resolved by Texas courts.

*     *     *

For the reasons set out, the court grants Johnson County's January 13, 2006 motion for summary judgment as to Peggy's § 1983 claims and, by Fed. R. Civ. P. 54(b) final judgment filed today, dismisses them with prejudice.  The court remands count V to the 18th Judicial District Court of Johnson County, Texas.

**SO ORDERED.**

June 21, 2006.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

– 31 –